May I proceed? Yes. Thank you. Good morning, I'm Keith Scully on behalf of Dr. Cornu-Labat, the appellant in this matter. I'd like to reserve five minutes for rebuttal. This is a sort of a broad-ranging case and I'm not entirely sure where it's going to go. All right. So the defendants in this matter want you to believe that Dr. Cornu-Labat's very public arrest in front of his son's high school team and an entire gymnasium full of friends and family is just sort of something bad that happened. It's like a lightning strike or it's like a hurricane. Maybe mistakes were made but no one's at fault and certainly no one is civilly liable for the fact that he was ultimately taken away in handcuffs even though he was doing nothing wrong. And I emphasized at the beginning and I won't repeat it again because I don't think I need to that he wasn't doing anything wrong here. He was entirely entitled to be in that auditorium. The arrest though wasn't just a lightning strike or a hurricane. It was started with a lie from Mehdi Merred to a police dispatcher. It was effectuated by a police reading of the word surveillance that stretches that term beyond all possible bounds. And it was further effectuated by reliance on a record that said don't rely on this record. This case of course revolves around the civil anti-harassment order. Washington courts take those things very seriously. They are procedurally very easy to get. This was the temporary version which you obtain ex parte. Just go into court, present an affidavit. There's no chance for rebuttal evidence and the other side doesn't even get noticed that it's going on. Then for the next two weeks that's the law. And accordingly Washington state courts pick their restrictions very carefully. They tailor them narrowly. In this case the Washington court chose three restrictions for those two weeks. Dr. Cornelabotte was not allowed to contact Alexa Merred. I mean you've got a lot of ground to cover. And you got it. Okay all right. Dive in. Which defendant are you going to focus on first? I'm going to focus on Grant County first. Okay and it's also Quincy. The district court found that Dr. Cornelabotte violated or there was probable cause to believe that he violated the surveillance prong of the civil anti-harassment order. If you agree with that, both Grant County and Quincy are off the hook because there's probable cause. Doesn't matter that the database was wrong. There's probable cause to arrest him for surveillance. Washington has told us what surveillance means. It's in Trumbull v. Washington. It means to keep a close watch on one or more persons. The evidence that he was doing that, he's in the auditorium and he could see Alexa from where he sat. If you buy into that definition, if you think that's probable cause to arrest because he was keeping a close watch on her, I could be arrested right now for surveilling any person in this courtroom. Unless there's an order against it. I mean you're not going to, you can surveil me but it's not illegal. I don't think you can be arrested for surveilling me because you're looking at me. Well that's right. Unless that we have an order. Well assuming that surveillance was a crime and in this case it was a crime. Assuming there's an order on me saying Mr. Scully you can't look at anybody in this courtroom. I apologize. You can't keep anybody in this courtroom under surveillance. There's probable cause to believe I'm keeping a close watch on any one of them. I can tell you I have no idea who's back there. I don't think any prudent person, which is the test for probable cause, would believe that there is a probability that I'm surveilling anyone or everyone in this courtroom. Didn't the temporary order contain the word school when it was looked at by the officers? So that matters only for the Quincy Police Department. Grant County Sheriff's Office is the one who made that erroneous data entry. The order did not. The order itself absolutely did not. Well we know the order didn't. Right. But we know that the version, the computer version, of the order did. Correct. Right? That's right. So I'm trying to understand right now what is your allegation against Grant County? The allegation that they were negligent in reproducing the order or what? So there's a negligence claim. There's also an integral participant claim under Section 1983. And there's an official policy claim under Section 1983. And Grant County cannot rely on the data entry error because they made it. And that's Rogan v. Los Angeles. If you create a false set of facts, you can't then say this false set of facts allows us to make an arrest on probable cause. That's a defense for Quincy who actually put the handcuffs on. That's not a defense for Grant County who made the data entry error. So probable cause for surveillance has to be more than same place, same time, line of sight. But let's talk about that error in the computer database. Quincy Police says okay fine. Fine. Maybe he wasn't surveilling her, but we're entitled to rely on the NCIC record which said in no uncertain terms school. And it did say no uncertain terms school. But it also said in all caps do not rely on this record. Contact the entering agency to confirm the terms. Wait a minute. But the officers who are responding, they don't see that. So there's one set of data. It's the NCIC data. What shows up on the computer terminal comes through the local access port which they call Spillman. During Officer Clark's 77 to 83, Officer Clark testified about NCIC. He knows where this data comes from. He knows the warnings there. He knows Spillman is the link to NCIC. And if Quincy's defense is really our officers must be told every single time not to rely on this data rather than just knowing it, these are not eight-year-olds. These are police officers. They know where the data comes from. They know the data tells them it is unreliable. So you're saying they couldn't rely on that Spillman computer, the terminal they've got? They had to go back and look into NCIC? Is that what you're saying? No. I'm saying that they had to follow what this court established in Byard v. Lewiston and they had to look to a reasonably reliable source for the terms of the order. Which was not Spillman. Not Spillman. So how on earth could they do that? How could they do that? Well, they could pick up the radio or they could pick up the phone and they could call dispatch and ask. Dispatch had the order. They knew dispatch had the order because they'd asked that it be faxed to the police department. And the odd twist in this case is Officer Clark testified that he did that. He knew the order was important. He picked up the phone and he asked that the language of the order be read over the phone. In briefing this court, they're arguing, well, dispatch maybe didn't actually do that. All they did is give the parameters of the order. But if you look closely at their brief, the parameters of the order, what he was read over the phone, is right. It does not and a source that tells them it's unreliable that in fact is what they relied on. It is not probable cause to ignore reliable sources and turn to unreliable ones to justify it. Can I ask you just on that point with respect to what dispatch said or what he did, in your view, is there a factual issue on that? At best, there's a factual issue for sure. I mean, in their brief, they outlined what the parameters is. And the parameters don't include the schools. So I think there isn't a factual issue. I think the facts go in our favor. To the extent they're arguing dispatch said something other than what the order is. Dispatch, in fact, misread the order. There's no evidence of that. So at best, that's a question of fact. And it's a question of fact based on a supposition, not based on any affidavit from dispatch or any affidavit from the officer. I'd like to focus just for a second on Nettie Morad because it's an entirely different set of legal questions that has to do with Washington's anti-SLAPP provision. I'm anxious to hear what you're going to say. I'm sure you are. It's a question of first impression. It's whether a knowingly false report of a crime to a police agency can possibly be reasonably of concern to that agency. It's a lot of words. Say that again. A knowingly false report. Right. So a knowingly false report can be reasonably of concern to that agency. So language of Washington's anti-SLAPP provision. Anti-SLAPP came out of a desire to protect people speaking at public meetings. But Washington's statute is broader than that. It is not unlimited. What it says is you have immunity when you speak to a government agency on a matter reasonably of concern to that agency. So if I call up the sewer department and say my neighbor has a meth lab, I'm not immunized for that. That's not reasonably of concern to the sewer department. There is no good faith requirement. Meaning I can really want to get Dr. Cornelabotte in trouble. I can call for all the wrong reasons. But if it's a true report, whether it's in good faith or bad faith, I'm immunized. Tough luck. But this is a false report. Mr. Moret called up and he said the order prevents Dr. Cornelabotte from being within 250 feet of my daughter Alexa. He admitted during deposition he knew that wasn't true. So how on earth can a false report be reasonably of concern to a police agency? In fact, it's criminalized. If you call up and you knowingly lie to the police and say a crime is going on, you can be locked in jail for that. And we're in the odd anomalous position that Moret, in theory at least, could be criminally prosecuted, but he was awarded $10,000 in attorney's fees and he can't be held civilly liable for the same conduct. It's a question of first impression. I analogize to the Knorr-Pennington doctrine, but I'm asking you to find that Washington's law does not immunize you from lying to the police. I'm just having some trouble, you know, Knorr-Pennington, which we see in antitrust and all kinds of other cases, really is a common law doctrine. And we have this Washington statute. So I'm not quite sure how we could import that into the statute. Well, I don't think you can. And I kind of regretted the analogy as soon as I made it. We'll drop it then. It's an analogy. I'm not asking you to import Knorr-Pennington. I'm just saying, like Knorr-Pennington, Washington's statute took these kind of situations in line. All right. I reserve my remaining time for rebuttal. Thank you. May it please the court. My name is Brian Walker, and I have the privilege to represent Mehdi Moret in this proceeding. I'm going to be focused just on the anti-SLAPP statute, and I'm going to try and be brief because opposing my co-counsel wants to get up here too. The state legislature drafted the anti-SLAPP statute. The state legislature amended that statute in 2002 to remove the good faith requirement. We have a court of appeals decision in Bailey that says there's no good faith requirement. I even noticed that after the briefing closed in this case, the Ninth Circuit has a case, Phoenix Trading Company, where Bailey is cited for getting rid of the good faith requirement. The argument seems to be that, well, you can make a bad faith reporting, but you can't make a false reporting. Well, that would gut the whole purpose of the statute. The statute is to let people call the police, or in this case, a school as well, and let the school and the police then make the decisions as to how to respond to the information they've been provided. That's what happened here. The school elected not to do anything. The police elected to arrest. If you adopt the argument of the plaintiff that if it's a false report, there's always going to be something that somebody could probably sue on to find falsity. Here, there's no dispute there was a TRO in place. That is not false. There's no false statement that Mr. Moret's daughter was at the basketball game, and so was the plaintiff. These are not false statements. It's just a misunderstanding as to what the scope of a temporary restraining order said. Well, that's not plaintiff's counsel's view. I mean, the allegation is that your client knew, knew damn well that it did not cover the situation at hand, but for completely malicious reasons decided to make a false report of a crime to the police. Yes, that's their legal theory, that my client had some subjective desire to get it at his client, not to protect his daughter by calling the police because there was a TRO that might have been being violated. And that's the whole point of the anti-SLAPP statute, is to protect someone in Mr. Moret's position, to let him notify appropriate authorities to take the action that those appropriate authorities deem appropriate. And you look at the policy that if you look at that Phoenix trading case, it talks about the policy of the statute, the state statute is to not chill the communication between the public and the government. It also, the Bailey case speaks in terms of letting the public communicate with government, so government can perform its function. And it's difficult to argue that safety in a school is not a legitimate government function. Yes, I'm more intrigued by the knowingly false aspect of it, because, you know, in other First Amendment contexts, we pose that kind of a heightened mens rea requirement. We say there's no chilling concern when we do that. It seems to me, you know, the same logic could apply here. I'm looking at the language of the statute says reasonably of concern to the relevant agency. And I do have a hard time seeing how a knowingly false report of anything could be of reasonable concern to the agency. Well, Plaintiff's counsel makes the argument that the police could have arrested Mr. Moret for a knowingly false police report. They could have done that, but they didn't do it. There's restrictions on someone in Mr. Moret's position to not make knowingly false reports. There are penalties he could face if he did that. The anti-slap statute, though, was drafted by the legislature, and they elected to take motive out of it. Motive was part of that statute for a period of time, and then the legislature met and drafted it out. They could take motive out, but did they take truth out? So if we have a situation of somebody sitting in the courtroom and I say, oh, that woman in the white sweater there, I called police. The woman in the white sweater, I actually saw her take that gentleman's wallet. That's totally false, okay? Police arrive. They see the lady in the white sweater. They see the guy. He's left probable cause to arrest, most likely, right? I mean, they have a witness. I've said exactly what I saw. I've described her. They show up. There she is. I just pick you because you have a nice white sweater on. But, you know, so my question is, you know, it's not you can't necessarily look at my motive. Maybe I have a dispute with this individual. That doesn't matter. Or maybe I had a bad day, or maybe I'm just whatever. But you could take out motive, it seems to me, and still leave in flat falsity. And that's kind of where we're having some trouble. Because what I just said, what I just called the police about, is just flat false. If you take, if you write falsity back into the statute that reports to police have to be accurate, then people aren't going to call the police. I'm not going to risk civil liability because I think... Well, there's a difference between accuracy and knowing falsity. Yeah, you're correct. And that would be a question, in fact, for the lower court to decide if it was knowingly false. Or did Mr. Moret have the same opinion that the police did, that there was a potential surveillance issue? Or was he innocently mistaken that the 250 feet applied at the school? I mean, those are our positions. But my point, before I wrap up, is essentially if I call because I believe, or I think somebody committed a crime against me, but I don't know, I'm wrong. That's going to have a tremendous chilling effect on people calling the police. Thank you. Good morning. My name is Jerry Mulberg. I'm privileged to represent the Quincy police officers in this case. And I started out as, I've been fortunate in my career to represent police officers for a long time. And I think we all recognize you have a very, very difficult job. And so the law has really required us to set the contrast of saying that out in the field, we're going to give the nod to the police officer to make those decisions. And that's one of these cases that you face today. Probable cause is a complete defense to the claims brought against Quincy police officers. And in this case, these officers had probable cause. They had probable cause based upon two different theories, really. The first is the conclusion of the officers that the order and the information they received from the order prohibited surveillance. These officers both testified in the record that given the fact that Mr. Cornelobot was in the building, was in straight view of Marriott's daughter, that that constituted in their mind surveillance. And it's not the police officer's responsibility to evaluate that in terms of whether or not a judge or a panel of judges looking back will say, well, technically, that might be surveillance, might not be surveillance. As long as the police officers are operating in good faith and have a reasonably articulated suspicion that this is surveillance. I guess I'm just at a loss to even understand how you think we can view this as surveillance. It just seems like he was there. I mean, based on the investigation the officers did, he was there to watch a basketball game, didn't even know that this other person was there until he was told that she was there. I mean, I don't even, none of that adds up in my mind to surveillance. Well, and that might be true at the trial on whether or not he's guilty. But in terms of being in the field as a police officer and having to analyze whether I have a reasonably articulated suspicion that surveillance could be occurring, I think it's a different perspective. What do you say to counsel's argument that they somehow should know that that computer, the terminal report that they got, is unreliable and they should have gone behind it to the NCIC report? Well, two things. One is I don't think there is any standard that says you have to go behind that. And also, as I cited in my brief, there's a long line of cases where the NCIC information has been determined as reliable, and I suspect that in many of those cases the same warnings might be on the paperwork. This court, this circuit has always said that it is appropriate for the police officers to rely on NCIC. So I think the fact that there might be some warning there doesn't change the course of the law, and it doesn't change the officer's duty. In addition, the officers never saw that warning, and there's nothing in this record to suggest, frankly, that this was an issue where they said, oh, my goodness, this is, you know, this is NCIC, and therefore we can't. I mean, really, the argument is you can't ever rely on NCIC because there might be this warning on the papers, and that is completely contrary to the law in the circuit. Secondly, the officers weren't aware of it, and that goes to the second issue, and that is the question of whether or not the schools within 250 feet out of school applied. The officers were entitled to rely on the information in Spielman. Spielman clearly said, and the dispatch clearly told them that this order was in effect, and that it involved the school, and that the officers relied on that, and they were entitled to rely on that. And if that information is mistaken, that does not defeat probable cause. The trial court both decided, both the surveillance issue and also that there was probable cause based upon the ultimately later determined erroneous information. It would defeat probable cause, but it just, the officer might be entitled to qualified immunity. Well, and that's a correct analysis, you're right, and that's what the trial court said, is that when you get to the question of qualified immunity, and that's really sort of where I think the, kind of the issue rests, and that is that these officers are entitled at the very least to qualified immunity. That they were acting, they were out there in a difficult situation, and you know, they didn't publicly arrest him in the middle of it. They were very careful to escort him out of the school building, and tried to be discreet about it, gave him an opportunity to leave. These are not bully cops. These are, if you've ever had the privilege to go to Quincy, it's a beautiful small town, but it's a small town. And they were, I think they were operating appropriately, and so at the very least, they're entitled to qualified immunity, and as we know, qualified immunity protects all but the incompetent officer from those kinds of mistakes, and this was a reliable, I mean, the officers checked, they believed they had the correct information, they had nothing to indicate the contrary, and would be entitled to qualified immunity. So under either, and I understand that the surveillance argument and the difficulty in a trial, or as we review it, you might decide, well, I don't think I'm going to convict this guy of surveillance, but at the same time, look at it from the officer's perspective. But then at the very least, the officers did what they believed was right, and they believed that the order prohibited him from being in the school 250 feet away, and it turned out later that that wasn't true. You cannot hold the officers liable for that. I'd be happy to answer any questions, but I want to reserve some time to my good friend and colleague, Mr. McFarland. All right. Thank you. May it please the court, good morning. Mick McFarland on behalf of Grant County. Mr. Scully led off his argument by noting that if the court finds probable cause, the court should affirm the trial court and dismiss the claims against Grant County and the Quincy police officers, and I completely agree with that. However, a finding of probable cause is not required in order to affirm the trial court's dismissal of Grant County, and that's for this reason. There is no dispute that the TRO had an anti-surveillance provision in it. The officers, as Mr. Moberg just told you, arrested Mr. or Dr. Cornu Labat in part based upon that surveillance prohibition. That means that if the erroneous information that was entered by Grant County was not part of the TRO, the officers would still have arrested Dr. Cornu Labat. Dr. Cornu Labat, therefore, cannot establish any causation element between the errors committed by Grant County. Wait a minute. Help me on this, though. I thought the theory against your client was that, hey, it's really you guys who are at fault for having this erroneous information entered in the thing in, what is it, Spillman or? But the officers are only going to make this arrest because they see this erroneous reference to school, and that it's really the county's failing on that front that allowed that to happen. So I guess I'm not clear on, if we say that there wasn't probable cause, it seems like even the district court recognized that, yeah, there might be a tribal issue of fact as to whether the county had a policy that was deliberately indifferent to the rights of people like the plaintiff here. Sure. I have two responses to that, Your Honor. First, I would agree with your analysis if Grant County erroneously entered information about the school, and that was the sole basis for the arrest of Dr. Cornu Labat, then we probably wouldn't be here today. However, what the record establishes is that the officers arrested Dr. Cornu Labat for violating two provisions of the TRO, the surveillance provision and the being at the school provision. And so my point is, if you take out the erroneous information, the being at the school, Dr. Cornu Labat still would have been arrested by the officers for allegedly violating the surveillance provision. And as it relates to Grant County, it doesn't matter whether the officers had probable cause or not, they've testified, we would have arrested him, and that precludes. I hear your argument. Let me ask you this. Is there a factual dispute as to whether the officers relied solely, I might put it in these terms, can the plaintiff make the case, let's say to a jury, that no, actually what the officers were really relying on was the school provision? This surveillance thing, yeah, they're saying now they relied on it, but that was just an after-the-fact justification. What they were really relying on was the school provision. No, Your Honor, because the only evidence that goes to their motive or what they based the arrest on is their own testimony, and that is undisputed in this case. Did that answer your question? Yeah, I mean, I'll be interested to hear what the plaintiff has to say in response, but that's your answer. Yes, thank you. Thank you. Thank you. Starting with the last question first, the officers wouldn't parse it out for me. I mean, during depositions, they said it was both. They said it was the schools and it was the surveillance prong. They would not answer, would I have arrested if it were on the schools or if it were only the surveillance prong. The test on official policy also, there's got to be a nexus, but it doesn't have to be the only factor that leads to the arrest. So we can proceed against Grant County unless you find there is probable cause under some reason. If there's probable cause, then this all goes away. Address, just for a moment, Mr. Mogard comments on qualified immunity. These are objective standards. I mean, small town cops trying to do the right thing, maybe, but it's got to be an objective standard and it's got to be applied regardless of what town you're in or what the circumstances are. And my entire argument is, you know, it's a set of reliable information that what Officer Clark told me is the Bible of reliable information. The order itself is the Bible of what he's supposed to be looking to in a situation like this. He had access to it and he chose to go to unreliable information. That is objectively unreasonable and it's not that he's incompetent, it's that he made an objectively unreasonable decision. Well, if he's not incompetent, then he's entitled to, are you talking about the officers now? I'm talking about the officers. I'm not, I'm not, I mean, this is not a competence or incompetence, I guess, I guess. That is what the Supreme Court has told us. All right. Well, then, then I guess it's incompetent and I try to avoid calling anyone incompetent. I don't see incompetence here. I see, maybe, you know, some negligence, negligence on there, but I don't see incompetence. Well, but... They had, they looked at the screen, it said school, they're out of school, and they go and proceed accordingly. Well, but they also said that you can't trust any source of the order itself. And we know that that's the case because, one, NCIC tells us so. Two, the officers tell us so. And three, we know the facts of this case. Wait a minute. NCIC's wrong. Are you saying that in every case before the officers respond to a claim that there's a violation of a temporary screening order, they have to go look at the original court order? If they have access to it, that is the source they need to look at. Well, what if it's a Saturday or Sunday and the court's closed? There are hypotheticals. What if they're in the middle of... That's not a hypothetical. That's two days a week. Well, so, okay. It's, and it's, you know, no more than eight hours a day. But the orders are kept by dispatch. That's 24 hours a day. There are hypotheticals. What if they're in the middle of the jungle? They spoke to dispatch. They did. And dispatch gave them the correct version of the order. Dispatch told them. And they also looked at the order on the computer terminal. They did not look at the order. They looked at the mis-entered data from NCIC on the computer terminal. And I'm saying they can't rely on the mis-entered data when they have the accurate data from dispatch. And they know that dispatch has the order and they know that's the accurate data. The hypotheticals would be different. But here you've got the truth and you've got something you know you can't rely on. You've got to pick the truth or it is objectively unreasonable. The line of cases that counsel referred to saying you can rely on NCIC was actually with arrest warrants and stolen cars. Those are binary questions. Is there an arrest warrant or is there not? Is there a stolen car report or is there not? It's not a detailed question like what are the terms of the order? They're entirely entitled to rely on NCIC for whether the order is still in effect. But, you know, repeating myself, once they've got access to the actual order, they've got to go to the actual order to look for the terms of it because NCIC tells them NCIC is inaccurate for that purpose. Would you go back to the SLAP statute because having, once they suck the good faith out of it, like it or not, it seems to be open season as long as you call public official on an issue of public interest. Reasonably of concern to that agency. Well, it would be reasonably of concern that there could be a potential violation. Sure. And if he called up and said... Definitely a reasonable concern to them. Yeah, sure. And if he called up and said, there's a protection order, my daughter's at the school and I'm scared for her, no question, that's fine. It's when you start telling knowingly, giving knowingly false information to the police. If you believe for whatever reason... That would be of interest to them too. To investigate men. Right. I mean, so I mean, but I guess if I hear you, you're saying that given Washington courts have interpreted the statute to give it this breadth, in order to come to your position, we would have to interpret the statute under the reasonably section to mean that it can't be knowingly false. In a report to a police department of a crime, I'm asking for that narrow holding. All right. Thank you. Thank you. The case of Cornelovat v. Moret is submitted. Thank all counsel for your argument this morning.
judges: Rothstein, McKEOWN, WATFORD